IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JACQUELIN GROSSER-SAMUELS,              §
                                        §
      Plaintiff/Counter-Defendant,      §
                                        §
VS.                                     §      NO. 4:06-CV-159-A
                                        §
JACQUELIN DESIGNS                       §
ENTERPRISES, INC.,                      §
                                        §
      Defendant/Counter-Plaintiff,      §
                                        §
and                                     §
                                        §
DU NOUVEAU DESIGNS, INC.,               §
                                        §
      Third-Party Plaintiff,            §
                                        §
VS.                                     §
                                        §
MICHAEL BURNS,                          §
                                        §
      Third-Party Defendant.            §

MEMORANDUM OPINION
and
ORDER

Before the court for decision is the motion of defendant and
counter-plaintiff, Jacquelin Designs Enterprises, Inc., ("JDE"),
and third-party plaintiff, duNouveau Designs, Inc.,
("duNouveau"), to disqualify George R. "Russ" Schultz ("Schultz")
and his firm, Schultz & Associates, P.C., ("Schultz Firm") as
counsel for plaintiff and counter-defendant, Jacquelin Grosser-
Samuels, ("Grosser-Samuels") and third-party defendant, Michael
Burns, ("Burns"), and to impose sanctions against those
attorneys.  The court has concluded that the motion to disqualify
should be granted as to Schultz and the other attorneys with his

firm, and that the request for sanctions should be held in abeyance.

I.

Grounds of the Motion

The issue of disqualification was first raised by an emergency motion filed by JDE and duNouveau on March 21, 2006, to stay proceedings pending discovery and ruling on disqualification issues.  That motion was briefly considered at the hearing conducted on March 21, which primarily was related to a motion for preliminary injunction.  The formal motion was filed March 29, 2006.  It was prompted by the recent discovery by counsel for JDE and duNouveau in the records of JDE of evidence that Schultz and his firm had served, and were serving, as attorneys for JDE.

JDE's records contained (1) a document titled "Revocation and Substitute Power of Attorney" executed by JDE, acting through Grosser-Samuels as its president,[1] in December 2005, appointing Schultz and his firm "to transact all business in the United States Patent and Trademark Office" in connection with a trademark held by JDE, and designating Schultz as JDE's "attorney with full power of substitution and revocation, to transact all business connected with [the trademark]," Mot. to Disqualify, App. at 30-31, and (2) a letter from Schultz, bearing the letterhead of Schultz & Associates, P.C., to the Commissioner of Trademarks dated December 19, 2005, transmitting the Revocation

―――――――――

[1]Grosser-Samuels was president of JDE until February 2006.  Tr. of Mar. 21, 2006, hr'g at 34.

2

and Substitute Power of Attorney together with three other
similar documents.[2]

The records also included invoices directed to JDE by its
business consultant, Kent Mansfield ("Mansfield") (who does
business as Tara Business Consulting), indicating that payments
were made during the year 2005 by JDE to the consulting firm for
time Mansfield devoted to conferences with Schultz relative to
the affairs of JDE, and for time devoted by the firm to the
preparation of checks payable to Schultz and the delivery of one
of the checks.  Mot. to Disqualify, App. at 18, 21, 25.

JDE and duNouveau maintain in their motion that Schultz and
his firm were attorneys for JDE when Schultz filed this action in
February 2006 for Grosser-Samuels, and that they should be
ordered disqualified because by filing this action against JDE
they violated rules of professional conduct that prohibit a
lawyer from representing a client if the representation of that
client will be adverse to another client and because their
representation of Grosser-Samuels and Burns against JDE in this
action involves a matter substantially related to the work
Schultz and his firm previously performed for JDE.

As another ground for disqualifying Schultz, JDE and
duNouveau expressed serious concerns that Schultz assisted

---

[2]The record shows that on March 29, 2006, eight days after the
request for disqualification was first presented to the court,
Schultz submitted to the Commissioner of Trademarks a document titled
"Withdrawal of Attorney" in which he said that the Revocation and
Substitute Power of Attorney was being withdrawn for the reason that
"[r]epresentation is likely to result in a conflict of interest."
Resp. App. at 107-108.

Grosser-Samuels in carrying out the conduct of which the counterclaims of JDE and duNouveau complain, pointing out that Schultz might well be called to testify as a witness and that there is a possibility that he will become a party to the litigation.

The request for sanctions feature of the motion is based on statements Schultz made to the court during a hearing conducted March 21, 2006, on a motion of JDE and duNouveau asking for injunctive relief, and deposition testimony Schultz gave on that same date, that JDE and duNouveau interpret to be unqualified representations by Schultz that he never served as an attorney for JDE.  JDE and duNouveau maintain that by giving false testimony concerning his representation of JDE, and by persisting in his representation of Grosser-Samuels and Burns, Schultz has caused JDE and duNouveau to expend unnecessary cost "in resolving this issue that could easily have been avoided if Mr. Schultz had acknowledged his attorney-client relationship with JDE at the [March 21] hearing."  Mot. to Disqualify at 7-8.  The movants add that, in addition, the court has "the inherent authority to enter an award of sanctions against the Schultz Firm for its conduct in the handling of this matter."  Id. at 8.

II.

Nature of the Litigation

A.    The Complaint.

Grosser-Samuels instituted this action through Schultz as her attorney on February 27, 2006, by a complaint naming JDE as the defendant.  The alleged facts on which she bases her claims are as follows:

Patent No. 6,484,535 B2 pertaining to an adjustable jewelry assembly was issued to Grosser-Samuels on November 26, 2002.  On March 20, 2005, Grosser-Samuels granted a license to Pacific Crown Holdings ("PCH") to make, use, and sell goods covered by the patent and to grant sub-licenses under the patent.  On or about July 1, 2005, PCH granted a license under the patent to JDE (the "JDE license") to sell merchandise in the wholesale jewelry industry that was covered by the claims of the patent.  In the JDE license, JDE agreed not to sell or distribute any goods that were covered by the claims of the patent after termination of the license.  JDE's rights under the JDE license terminated on February 26, 2005.  Notwithstanding termination of the JDE license, JDE has continued to sell and distribute goods that infringe the patent, and has contracted to deliver the infringing goods through July 2006.

Based on those facts, Grosser-Samuels alleges that JDE, with full knowledge of the patent, is willfully and intentionally infringing the patent, and is actively inducing others to infringe it, and that the infringement started as early as March

1, 2006.  Grosser-Samuels requests as relief (a) the grant of a
preliminary, and then permanent, injunction restraining defendant
from infringing, and inducing others to infringe, the patent, (b)
a judgment against JDE for patent infringement damages, trebled,
and (c) recovery from JDE of reasonable attorney's fees and costs
of court.

B.    The Counterclaim.

On March 8, 2006, JDE filed its original answer and
counterclaim.  It joined duNouveau as a third-party plaintiff and
named Burns as a third-party defendant.  By the counterclaim, JDE
and duNouveau seek injunctive relief against Grosser-Samuels and
Burns, a judgment awarding JDE and duNouveau damages against
Grosser-Samuels and Burns caused by the allegedly improper
conduct described in the counterclaim, and an order directing
that Patent No. 6,484,535 B2 be assigned to JDE.  The facts
alleged by JDE and duNouveau on which their counterclaim against
Grosser-Samuels and Burns is based are, in summary, as follows:

1.    On November 26, 1997, Grosser-Samuels, The Baguette
Source, Inc. ("BEI"), and Jacquelin Enterprises, Inc. ("JEI"), on
the one hand, and JGS, Inc., on the other, entered into an
agreement whereby JGS, Inc., acquired certain assets of Grosser-
Samuels, BEI, and JEI.  On February 23, 1998, JGS, Inc. sold to
duNouveau all of JGS, Inc.'s assets.  On April 18, 1998, Grosser-
Samuels entered into an employment agreement with duNouveau
effective March 1, 1998, pursuant to which she became duNouveau's
Chief Creative Officer and Head Designer for a period of three

6

years.   During the course of her employment by duNouveau,
Grosser-Samuels also served as president and director of
duNouveau.   On December 1, 1998, Grosser-Samuels resigned from
her positions with duNouveau; and, effective that same date, she
entered into an employment agreement with JDE pursuant to which
she was retained as Designer of Jewelry on an exclusive basis for
JDE's international jewelry business for a period of twenty-four
months.   During Grosser-Samuels' employment with JDE, she also
served as president and director of JDE.   In an addendum to her
employment agreement with JDE, Grosser-Samuels acknowledged that
in November 1998, while employed by duNouveau, she designed
"certain mechanics" attached to jewelry for which she intended to
seek a patent if the design was successful.   Answer &
Counterclaim at 7, ¶ 9

        2.   Grosser-Samuels' duties as Designer of Jewelry for JDE
included developing (1) new jewelry designs under the "Jacquelin"
name, (2) marketing those designs in conjunction with JDE's
jewelry business, and (3) developing business relationships on
behalf of JDE based upon those designs.   A provision in the
employment agreement between JDE and Grosser-Samuels provided
that the design by Grosser-Samuels "under the employ of JDE is
proprietary to JDE which is to launch the products/collections to
luxury retail points of sale."   Id. at ¶ 11.   Another provision
provided that "[a]ll designs and the work product relating to and
leading to such designs, created by [Grosser-Samuels] during the

7

term [of the agreement], shall become and shall remain Intellectual Property owned by JDE."  Id. at ¶ 12.

3.   While her employment agreement with JDE was in force, Grosser-Samuels did the following:

(a)  On February 24, 1999, she caused a patent application for an adjustable necklace clasp to be filed with the U.S. Patent and Trademark Office, which was issued as patent number 6,202,443 B1 on March 20, 2001.

(b)  On April 28, 1999, she caused a patent application for a jewelry display device to be filed with the U.S. Patent and Trademark Office, which was issued as patent number 6,205,688 B1 on March 27, 2001.

(c)  On January 16, 2001, she caused a patent application for a continuation of the adjustable necklace to be filed with the U.S. Patent and Trademark Office, which was issued as patent number 6,484,535 B2 on November 26, 2002.

4.   After filing those patents, Grosser-Samuels sold them to PCH, which is a fictitious corporation owned and operated by Grosser-Samuels' parents.  On March 21, 2005, and again on July 1, 2005, PCH and Grosser-Samuels, purporting to act as president of JDE, executed a revocable license and royalty agreement whereby PCH, in exchange for a licensing fee, agreed to permit JDE to produce, purchase, and resell certain component parts of mechanisms associated with the patents.  On December 28, 2005,

PCH notified JDE by letter of PCH's intent to revoke their
license and royalty agreement effective sixty days thereafter.

5.   On February 3, 2006, Grosser-Samuels resigned from her
positions at JDE and duNouveau.[3]  PCH sent a letter to JDE on
February 17, 2006, admonishing JDE for attempting to purchase one
of Grosser-Samuels' designs from a PCH supplier, and threatening
the initiation of a patent infringement lawsuit.

6.   Upon leaving JDE, Grosser-Samuels removed, without
authorization, all company files from her office, including
confidential and proprietary information; and, Grosser-Samuels
has attempted to use the information she obtained and other
confidential information of JDE to set up a business in
competition with JDE.  Grosser-Samuels had been planning since as
early as 2001 to set up such a competing business using JDE's
confidential and proprietary information at a time when she was
acting as President and Director of JDE.

7.   Since Grosser-Samuels' departure from JDE, JDE has
received a communication from one of its suppliers that the
supplier no longer can supply JDE with certain jewelry components
due to restrictions placed upon the supplier by PCH; and, certain
of JDE's clients have expressed doubt to JDE's personnel about
JDE's ability and legal right to market and distribute products

---

[3]The allegations of the counterclaim do not give an explanation
of the facts that led to Grosser-Samuels serving as an officer and
employee of JDE and duNouveau in February 2006.  Rather, as noted in
the text, the allegations suggest that Grosser-Samuels no longer was
an officer, employee, and director of duNouveau after December 1,
1998, and that her employment with JDE was to be for a two-year term
commencing December 1, 1998.

that were developed during Grosser-Samuels' employment.  And,
since her termination from JDE, Grosser-Samuels has used
confidential and proprietary information of JDE and duNouveau,
including information about their models, jewelry designs, market
strategy, vendor and customer information, and pricing
information, to develop and market identical products to
customers of JDE and duNouveau at reduced prices.

     8.   While employed with duNouveau and JDE, Grosser-Samuels
committed substantial waste of company resources through the
hiring of her friends and family, paying for the rent and other
personal expenses for her boyfriend and herself, taking personal
trips at the expense of JDE and duNouveau, and purchasing
personal goods and services for those people with the funds of
JDE and duNouveau.  Grosser-Samuels' boyfriend, Burns, was hired
by Grosser-Samuels as JDE's Director of Information Technology,
having the responsibility for setting up and establishing JDE's
corporate websites.  At about the time of Grosser-Samuels'
resignation from JDE, Burns blocked JDE's access to its corporate
websites, and has since refused to provide JDE management with
appropriate access codes, with the result that JDE has been
unable to access its own corporate websites.

     JDE and duNouveau assert in the counterclaim causes of
action against Grosser-Samuels or Grosser-Samuels and Burns for
conversion, tortious interference with business relationships,
defamation, breach of contract, breach of fiduciary duty of

loyalty, misappropriation, unjust enrichment, and violation of the Texas Theft Liability Act.

The allegations of the conversion claim are that by obtaining patents and trademarks on designs formulated by Grosser-Samuels during the course of her employment with JDE and duNouveau, and by utilizing confidential and proprietary customer information and good will obtained during that employment to obtain a competitive advantage, Grosser-Samuels committed unlawful conversion.  The claim of tortious interference with business relationships is based on a theory that Grosser-Samuels tortiously interfered with the business relations and prospective business relations of JDE and duNouveau by providing false information to Grosser-Samuels' suppliers, customers, and potential customers regarding the ability and legal right of JDE and duNouveau to conduct their businesses, and by using confidential and proprietary information to conduct Grosser-Samuels' own business.  The defamation claim is based on alleged false statements Grosser-Samuels has made to suppliers and customers of JDE and duNouveau.  The allegations of the breach of contract claim are that Grosser-Samuels breached her agreement with JDE by obtaining patents and trademarks on jewelry designs developed and marketed by her during the course of her employment with JDE.  The allegations of the breach of fiduciary duty of loyalty claim are that Grosser-Samuels owed a fiduciary duty of loyalty to JDE and duNouveau to act solely in their benefit in all matters connected with her employment, and to do no act

11

tending to injure their business or financial interests.  The misappropriation claim asserts that by using information Grosser-Samuels and Burns acquired during their employment relationships with JDE they have misappropriated confidential and proprietary information of JDE and duNouveau to their damage.  The allegations of the unjust enrichment claim are that Grosser-Samuels has unjustly enriched herself by accepting monies in conjunction with intellectual property owned by JDE and duNouveau.

C.   <u>Response to the Counterclaim</u>.

     The response of Grosser-Samuels and Burns to the counterclaim was filed on their behalf by Schultz as their attorney.

III.

<u>Standards to be Applied in Determining<br>Whether Conflict Disqualification is Required</u>

     This court is obligated to take measures against any unethical conduct occurring in connection with this action.  <u>See Musicus v. Westinghouse Elec. Corp.</u>, 621 F.2d 742, 744 (5th Cir. 1980).  <u>See also</u> <u>In re American Airlines, Inc.</u>, 972 F.2d 605, 611 (5th Cir. 1992).  A motion to disqualify counsel, such as the one now before the court, "is the proper method for a party-litigant to bring the issues of conflict of interest or breach of ethical duties to the attention of the court."  <u>Musicus</u>, 621 F.2d at 744. The Fifth Circuit has elected "to remain 'sensitive to preventing conflicts of interest,'"  <u>American Airlines</u>, 972 F.2d at 611.  In

12

American Airlines, the Fifth Circuit, as it had done in the past, rigorously applied the relevant ethical standards in reviewing the disqualification motion.  Id.

In answer to the question of "whether a law firm may sue its own client, which it concurrently represents in other matters," the Fifth Circuit said in In re Dresser Indus., Inc. "[i]n a word, no."  972 F.2d 540, 541 (5th Cir. 1992).  "Neither the ABA Model Rules of Professional Conduct nor the Code of Professional Responsibility allows an attorney to bring a suit against a client without its consent."  Id. at 544 (footnotes omitted).

There can be exceptional circumstances where a clear impropriety will not determine the outcome of a motion to recuse based on a conflict of representation.  Id. at 545.  An attorney might be able to engage in dual representation if he can show "some social interest to be served by his representation that would outweigh the public perception of his impropriety."  Id. If there is no suggestion in the record that another lawyer could not ably perform the representation at issue or that there is a societal or professional interest to be served by continuing the representation, concurrent representation should lead to disqualification.  Id.

When a former client moves to disqualify an attorney who appears on behalf of its adversary, the law of the Fifth Circuit is "fairly straightforward" that the movant "need only to show that the matters embraced within the pending suit are substantially related to the matters or cause of action wherein

the attorney previously represented [it]." <u>Wilson P. Abraham</u>

<u>Constr. Corp. v. Armco Steel Corp.</u>, 559 F.2d 250, 252 (5th Cir.

1977).  As the Fifth Circuit explained in <u>Abraham</u>:

> This rule rests upon the presumption that confidences
> potentially damaging to the client have been disclosed
> to the attorney during the former period of
> representation.  The Court may not even inquire as to
> whether such disclosures were in fact made or whether
> the attorney in fact is likely to use the damaging
> disclosures to the detriment of his former client.  The
> inquiry is limited solely to whether the matters of the
> present suit are substantially related to matters of
> the prior representation, and this is because this
> Court recognizes that in order to aid the frank
> exchange between attorney and client, it is necessary
> to preclude even a possibility that information given
> in confidence by a former client will ever be used
> without that client's consent.

<u>Id.</u> (citation omitted).  The presumption to which the Fifth

Circuit referred in <u>Abraham</u> is irrebuttable.  <u>American Airlines</u>,

972 F.2d at 614 (saying that "[o]nce it is established that the

prior matters are substantially related to the present case, the

court will irrebuttably presume that relevant confidential

information was disclosed during the former period of

representation" (internal quotation marks omitted)).  There is a

second irrebuttable presumption that confidences presumably

obtained by an individual lawyer will be shared with the other

members of his firm.  <u>Id.</u> n.1.

The party seeking disqualification has the burden to prove

that the present and prior representations are substantially

related.  <u>Id.</u>  Once the movant establishes a substantial

relationship between the past and current representations,

disqualification is required, but "a substantial relationship may

14

be found only after the moving party delineates with specificity
the subject matters, issues and causes of action common to prior
and current representations and the court engages in a
painstaking analysis of the facts and precise application of
precedent." Id. (internal quotation marks omitted).  Two
concerns underlie the substantial-relationship test: "the duty to
preserve confidences and the duty of loyalty to a former client."
Id. at 618 (internal quotation marks omitted).  The duty of
loyalty to the client is one of the basic tenants of the legal
profession.  Douglas v. DynMcDermott Petroleum Operations Co.,
144 F.3d 364, 370 (5th Cir. 1998).  "The purpose of ethical
precepts is to preserve public confidence in the bar and in the
legal process." Id. (internal quotation marks & brackets
omitted).

    The rule expressed in Abraham, and repeated in later cases,
is a reenforcement of the applicable rules governing the
professional conduct of attorneys.  559 F.2d at 252.  More
generally, "[m]otions to disqualify are substantive motions
affecting the rights of the parties and are determined by
applying standards developed under federal law." Dresser, 972
F.2d at 543.  Generally speaking, a motion to disqualify is
"governed by the ethical rules announced by the national
profession in the light of the public interest and the litigants'
rights." Id.  The Fifth Circuit's "source for the standards of
the profession has been the canons of ethics developed by the
American Bar Association." Id.  Ethical standards of the forum

state are to be taken into account as well.  See Horaist v.

Doctor's Hosp. of Opelousas, 255 F.3d 261, 266 (5th Cir. 2001);

E.E.O.C. v. Exxon Corp., 202 F.3d 755, 759 (5th Cir. 2000);

Cramer v. Sabine Transp. Co., 141 F. Supp.2d 727, 730 (S.D. Tex.

2001).

     Included in the ABA standards is the admonition that

"lawyers should avoid 'even the appearance of impropriety.'"[4]

Dresser, 972 F.2d at 543 (citing Brennan's, Inc. v. Brennan's

Restaurants, Inc., 590 F.2d 168, 171 (5th Cir. 1979)).  However,

the appearance-of-impropriety standard should be applied with

caution.  Woods v. Covington County Bank, 537 F.2d 804, 813 (5th

Cir. 1976).  For disqualification to be based on a violation of

that standard of conduct, "there must be at least a reasonable

possibility that some specifically identifiable impropriety did

in fact occur."  Id.  Disqualification is not always required

"even where there is a reasonable possibility of improper

professional conduct."  Id. n.12.  The court "must also find that

the likelihood of public suspicion or obloquy outweighs the

---

     [4]In In re American Airlines, Inc. the Fifth Circuit suggested
that the "appearance of impropriety" standard no longer applies in
the court's probe of ethical restraints.  972 F.2d 605, 617-19 (5th
Cir. 1992).  However, only approximately two weeks earlier the Fifth
Circuit noted in In re Dresser Industries, Inc. that it has applied
particularly the admonition in canon 9 of the American Bar
Association's Canons of Ethics that lawyers should avoid even the
appearance of impropriety.  972 F.2d 540, 543 (5th Cir. 1992).  As
recently as 2001 the Fifth Circuit gave effect to the ABA Code of
Professional Responsibility (in which the "appearance of impropriety"
standard is expressed) even though it had been replaced by the ABA
Model Rules of Professional Conduct.  Horaist v. Doctor's Hosp. of
Opelousas, 255 F.3d 261, 266 (5th Cir. 2001) (stating that ethical
canons relevant to the disqualification issue before the court
include the ABA Model Code of Professional Responsibility and the ABA
Model Rules of Professional Conduct).

social interest which will be served by a lawyer's continued participation in a particular case." Id. See also Horaist, 255 F.3d at 266.

IV.

### Disqualification of Schultz is Appropriate
### Under the Fifth Circuit's Conflict Standards

In reaching decisions as to the difficult issues presented by the motion to disqualify, the court has made a painstaking evaluation of the pleadings; the motion and response, reply, and supplements; the contents of all appendices; and, the record of the hearing held March 21, 2006, at which JDE and duNouveau first presented their request for disqualification and made a partial record in support of the request.

After such an evaluation, the court has concluded that it cannot accept as reasonable the explanations given by Grosser-Samuels, Schultz, and Mansfield for the evidence adduced by JDE and duNouveau that shows that Shultz and his firm were serving as attorneys for JDE, albeit in a limited area, from December 2005 until late March 2006.  While the court has uncertainty as to the reason why Schultz and his firm assumed the capacity as attorneys for JDE, the court is satisfied that they did so knowingly and voluntarily.

The record supports the contention of JDE and duNouveau that only two months before Schultz filed this intellectual-property action on behalf of Grosser-Samuels against JDE he and his firm were designated in writing by JDE, acting through Grosser-Samuels as president of JDE, as JDE's "attorney to transact all business

17

in the United States Patent and Trademark Office connected [with a particular trademark application]," and, Schultz, in particular, was designated as JDE's "attorney with full power of substitution and revocation, to transact all business connected with" the trademark application.  Mot. to Disqualify, App. at 30.  On December 19, 2005, Schultz mailed that power of attorney document ("power of attorney"), along with others, to the Commissioner of Trademarks.   Schultz was serving in the fiduciary capacity created by that document when he filed this suit against his client, JDE.  Not until eight days after JDE first requested disqualification did Schultz take steps to disengage himself and his firm from their legal representation of, and fiduciary obligation to, JDE.  That is when Schultz prepared a "Withdrawal of Attorney" document for submission to the Commissioner of Trademarks, withdrawing from representation of JDE as to the intellectual property matter mentioned in the power of attorney, giving as his reason for the withdrawal that "[r]epresentation is likely to result in conflict of interest."  Resp. to Mot. to Disqualify, App. at 107.

In an attempt to explain away the power of attorney, Grosser-Samuels states in her declaration that, because she had signed so many similar documents, she was not aware at the time she signed the power of attorney that she was "granting a Power of Attorney to the law firm that represented [her] personally to act on behalf of JDE."  Resp. to Mot. to Disqualify, App. at 3.  Mansfield's answer to the power of attorney is his declaration

18

that he "did not give authorization for the Attorneys to file a
Revocation and Power of Attorney for the mark 'THE MINI'S BY
JACKIE G.'" Id. at 9, ¶ 14.  Schultz's explanation of the power
of attorney is that a paralegal in his office, while preparing
documents pertaining to personal trademark and/or patent
applications of Grosser-Samuels, "in good faith, but in error,
prepared one extra Power of Attorney for the mark 'THE MINI'S BY
JACKIE G', which was later learned to be owned by JDE." Id. at
22, ¶ 8.

    The court finds those explanations incredible.  The power of
attorney could not more pointedly say that it pertains to an
application filed by JDE, starting out with the language that
"Jacquelin Design Enterprises, Inc. is the owner of the entire
right, title and interest of the trademark Application listed
below."  Mot. to Disqualify, App. at 30.  It then, again using
JDE's name, very specifically says that JDE, "by and through its
undersigned representative," appoints Schultz and his firm to act
in the capacities stated in the power of attorney. Id.  Nor
could anyone have believed that the document dealt with the
personal affairs of Grosser-Samuels when the signature block was
as follows:

             JACQUELIN DESIGNS ENTERPRISES, INC.


             By:  /s/ Jacquelin

             Printed Name:  Jacquelin Grosser Samuels

Title:  President

Id. at 31.

Schultz, Grosser-Samuels, and Mansfield undoubtedly discussed the matter before the power of attorney was prepared and filed.  As early as September 2005 Schultz was conferring with Mansfield, a business consultant in the employ of JDE, concerning intellectual property issues.  Mot. to Disqualify, App. at 18.  In November 2005, Mansfield and Grosser-Samuels had a telephone meeting to discuss Schultz's law firm and the setting up of a meeting for additional work on filings.  Id. at 21. Again in November 2005 Mansfield devoted time to preparing a check for Schultz and delivering it "along with scope of work for additional filing maintenance."  Id.  On December 7, 2005, Mansfield had lunch with Schultz and Grosser-Samuels concerning intellectual property matters.  Id. at 25.  The time devoted by Mansfield to all those activities was charged to, and paid for by, JDE.  Id. at 20, 22, 26.

The fact that the participants knew what they were doing when they arranged for Schultz and his firm to be attorneys for JDE in reference to the trademark application finds support in the records of billings by Schultz's law firm to Grosser-Samuels. The law firm devoted significant time between December 1 and December 19, 2005, to reviewing trademark application information, drafting and reviewing power of attorney documents, and filing the documents.  Resp. to Mot. to Disqualify, App. at 61-62.  On December 1 an employee of Schultz's firm reviewed

20

materials received from "client," did research to determine the
status of trademarks, and drafted a memo and "status matrix."
Id. at 61.  On December 7 the same employee drafted several
powers of attorney for various trademarks.[5]  Id.  On December 7
Schultz met "with Client re status of applications [and reviewed]
United States Patent and Trademark Office database information."
Id.  On December 9 Schultz reviewed and revised a power of
attorney; and, another attorney in the office reviewed trademark
registrations and applications, checked the status of each
application and registration with the United States Patent and
Trademark Office database, reported to a partner concerning eight
separate applications and registrations, and drafted, reviewed,
and revised powers of attorney.  Id.  The drafting, reviewing,
and revising of powers of attorney for various trademarks was
resumed on December 13.  Id.  On December 19 one of the attorneys
created a "summary spreadsheet of ownership of intellectual
property."  Id.  A second December 19 entry notes the activities
of two attorneys.  Id. at 62.  First, the activity was noted to
be "[r]eview Power of Attorneys received from client and
attention to filing with USPTO."  Id.  The other attorney was
Schultz, who on December 19 reviewed various power-of-attorney
documents, had a telephone conference with "Client," and devoted

---

[5]The December 1 entry and the first part of the December 7 entry
show "KLN" as the initials of the service provider.  Presumably "KLN"
is the "Kristy Needham," a paralegal, whom Schultz, in his
declaration, credits with preparing in error the power of attorney
appointing Schultz and his firm as attorneys for JDE.

"[a]ttention to filing Power of Attorney documents with the United States Patent and Trademark Office."  Id. at 62.

The court is unwilling to accept the contentions that, after all those reviews, studies, and revisions, a power of attorney naming Schultz and his firm as attorneys for JDE was prepared by accident, such a power of attorney was accidently signed by Grosser-Samuels, and Schultz, following his final review of the documents, accidently sent such a power of attorney to the Commissioner of Trademarks.  The failure of Grosser-Samuels to present a credible explanation that would support disregard of the power of attorney leaves the court no choice but to accept the power of attorney, the transmittal letter to the Commissioner of Trademarks, and the "Withdrawal of Attorney" document at face value, i.e., that JDE appointed Schultz and his firm as its attorneys with respect to a trademark application, that Grosser-Samuels knew that JDE was making the appointment when she signed the power of attorney as president of JDE, that Schultz knew that he and his firm were being appointed as attorneys for JDE, that Schultz knew when he sent the document to the Commissioner of Trademarks that he was filing a document that designated him and his firm as attorneys for JDE with respect to the intellectual property matter mentioned in the document, and that Schultz and his firm continued to be designated as attorneys for JDE until late March 2006.

Under the Fifth Circuit case authority previously discussed, the motion to recuse had merit at the time it was filed.  At that

22

time Schultz was serving as an attorney for JDE at least in
respect to an intellectual property matter pending before the
Commissioner of Trademarks.  Schultz recognized the problem when
he prepared and submitted his "Withdrawal of Attorney" with the
explanation that his representation of JDE was likely to result
in a conflict of interest.  Notably, he did not give as a reason
that the designation of him and his firm as attorneys for JDE was
a mistake or otherwise was unintended.

There being no showing of a social interest to be served by
Schultz's representation of Grosser-Samuels and Burns in this
action that would outweigh the public perception of his
impropriety or that JDE consented to the representation, Schultz
was disqualified from filing this action and from representing
Grosser-Samuels and Burns in defense of the counterclaim.  The
court further concludes that the termination by Schultz in late
March 2006 of his and his firm's attorney-client relationship
with JDE does not cause the then meritorious motion to disqualify
to become less meritorious.

Even if the court were to view the matter from the
standpoint of an attorney representing a party to litigation
against a former client, the outcome would be the same.  As noted
above, the court is convinced that Schultz served as an attorney
for JDE in respect to at least one intellectual property matter.
The court assumes, for the sake of discussion at this point, that
Schultz's representation of JDE discontinued sometime before this

23

suit was filed in February 2006.  Schultz's former intellectual
property representation of JDE is substantially related to the
intellectual property issues raised by the pleadings in this
case.  Thus, there is an irrebuttable presumption that relevant
confidential information pertaining to the affairs of JDE was
disclosed to Schultz while he was acting as attorney for JDE.
The disclosures could have been by Grosser-Samuels, the then
president of JDE, or by Mansfield, the business consultant for
JDE.  Therefore, under the assumed fact, Schultz would be
disqualified from representing Grosser-Samuels against JDE in
this action.

If the appearance-of-impropriety standard is applied to this
case, the need for disqualification would become even more
apparent.[6]  In addition to the direct conflict discussed above, a
reasonable inference the court draws from the record of this case
is that in the latter part of 2005 Schultz not only was serving
as an attorney for JDE, at least as to an intellectual property
matter, he at the same time was cooperating with Grosser-Samuels
in furtherance of a secret plan she had, while serving as
president of JDE, to take from JDE and convert for her personal
interest intellectual property assets, as well as customers, of

---

[6]In <u>In re American Airlines, Inc.</u>, the Fifth Circuit used
language that would suggest that even if the appearance-of-
impropriety standard no longer applies, it indirectly lives on as an
ingredient of the ethical prohibition against appearing on behalf of
a former client's adversary under certain circumstances.  972 F.2d
605, 611 (5th Cir. 1992).

24

JDE.[7]  The court has noted from items in the record that activity
was devoted by Schultz and his firm to causing JDE's trademarks
to be treated as the property of Grosser-Samuels personally.
Defendant's Exhibit 10 to the March 21 hearing was identified as
depicting trademarks of JDE.  Tr. of Mar. 21, 2006, hr'g at 45.
The trademarks claimed by JDE include "Jacquelin," "True," and
"Magic by Jacquelin."  Those trademarks were the subjects of
activity by Schultz and his firm on behalf of Grosser-Samuels in
December 2005 and January 2006.  Mot. to Disqualify, App. at 29;
Resp. to Mot. to Disqualify, App. at 52, 54, & 55.

     The fact that Schultz, Grosser-Samuels, and Mansfield would
be working together to advance the personal interests of Grosser-
Samuels while she was serving as president of JDE defies ethical
explanation.  According to Mansfield's declaration, in September
2005 he was hired, presumably by Grosser-Samuels (with whom he
had been acquainted since they were in high school), as a
consultant for JDE.  Resp. to Mot. to Disqualify, App. at 6-7, ¶¶
2 & 3.  In that capacity, he was "to review a number of different
business issues that JDE was facing at the time, including cash

_____

     [7]Grosser-Samuels' collaboration with Schultz was not the first
time Grosser-Samuels, while serving as president of JDE, secretly
collaborated with someone to the potential detriment of JDE.
Defendant's Exhibit 11 to the March 21, 2006, hearing  exposes a plan
by Grosser-Samuels in 2001, which was aborted for some reason, to
secretly appropriate JDE's business for her personal benefit and for
the benefit of the person collaborating with her.  Grosser-Samuels
tells her then collaborator that "[m]y objective is to get our new
venture up and rolling while I am on [JDE's] payroll transitioning
their company," that "I need the $ until I get my house sold and our
company up and running," and that "I think the mission should begin
taking place behind the scenes as long as possible 1) because I am
being paid . . . ."  Def.'s Ex. 11, first page, ¶¶ 1 & 3.

flow difficulties, operating efficiency and control and general business matters such as leases and contracts." Id. at 7, ¶ 3. The intensity of his activity, purportedly on behalf of JDE, and the cost to JDE of his activity, is partially disclosed by Mansfield's billings that accompanied the motion to disqualify. Mot. to Disqualify, App. at 16, 18, 21, 24-25.  The billings disclose that Mansfield was playing a role in running JDE in cooperation with Grosser-Samuels as its president.  At the same time, the two of them, in cooperation with Schultz, were engaged in significant activity to further the personal interests of Grosser-Samuels to the detriment of JDE.[8]  In other words, each of them appears to have been acting in violation of fiduciary obligations owed to JDE.  One of the subjects of all of that activity is the very patent upon which Grosser-Samuels bases her claim against JDE in this action.

Similar ethical concerns relate to the transactions of Grosser-Samuels, Mansfield, and Schultz in reference to an entity they refer to as "Pacific Crown Holdings" or "PCH."  Information

----

[8]Considering Mansfield's obligations to JDE, one would certainly puzzle over the activities he engaged in on behalf of Grosser-Samuels personally, as reflected by his declaration.  Resp. to Mot. to Disqualify, App. at 7-11.  Not only was Mansfield, while employed as a consultant by JDE, providing services to its president to the detriment of JDE, he was charging JDE for the time he devoted to those services.  In addition to the examples mentioned above in the text, there is an entry dated December 9, 2005, worded as follows:

Review comms from Russ Schultz and begin review of budget for next ninety days on trademark issues for JDE. Relegate issues of JGS personal ownership of trademarks to JGS for her discussion with Russ.

Mot. to Disqualify, App. at 25.

developed at the March 21 hearing causes the court to think that
the allegations made in the counterclaim relative to PCH
basically are correct.  <u>Supra</u> at 8-10, ¶¶ 4, 5, & 7.[9]  When the
ethical concerns related to Schultz's apparent collaboration with
Grosser-Samuels in the breach of her fiduciary obligations to JDE
are combined with the conflict-of-interest issues arising from
the designation by Schultz and his firm as attorneys for JDE, a
serious appearance of impropriety problem exists.  Public
suspicion almost certainly would arise from the representation by
Schultz or any attorney associated with his firm of Grosser-
Samuels and Burns in this action.  That suspicion outweighs any
social interest that continued representation conceivably could
serve.  There is no suggestion that other lawyers could not
represent Grosser-Samuels and Burns as ably as Schultz or any
attorney associated with his firm.

For the reasons given above, the court is ordering that
Schultz and the attorneys associated with his firm are
disqualified from serving as an attorney for Grosser-Samuels and
Burns in this action.

V.

<u>The Ground of the Motion Based on the</u>

---

[9]Evidence received at the March 21 hearing indicates that JDE
and duNouveau might be in error in alleging that Pacific Crown
Holdings is a corporation.  The document that purportedly gave PCH
rights in the patent for the adjustable clasp recites that it is a
grant by Grosser-Samuels to "Edwin Lail dba Pacific Crown Holdings
(PCH)."  Pl.'s Ex. 13, first page.  Thus, that document would suggest
that the transfer by Grosser-Samuels of rights to license the
adjustable clasp were to her father, personally, doing business as
Pacific Crown Holdings, and not to a corporation.

<u>Prospect that Schultz Might be a Witness in,</u>
<u>if not a Party to, the Litigation</u>

Because of the conclusions the court has reached that
Schultz has a conflict disqualification, the court is not
devoting significant attention in this memorandum opinion to the
ground of the motion urging disqualification based on the
prospect that he could be called as a witness in this action and
might well be made a party.  The court notes, however, that this
ground raises serious concerns.  Schultz probably did assist
Grosser-Samuels in engaging in the conduct of which JDE and
duNouveau complain by their counterclaim.  Undoubtedly he would
argue that he legitimately did so as Grosser-Samuels' personal
attorney.  But, the record suggests that the more persuasive
arguments would be that he violated a fiduciary duty to JDE when
he did so, and that he joined with Grosser-Samuels and Mansfield
in their violations of their fiduciary duties to JDE.  That being
so, he probably would be a witness, if not made a party.

VI.

<u>Request that Schultz's Law Firm be Disqualified</u>

The court is not ordering disqualification of Schultz's law
firm as such, because the court does not consider that the law
firm represents Grosser-Samuels or Burns in this action, only
Schultz individually.  However, the court is interpreting the
motion to disqualify as including a request that all attorneys
associated with Schultz's firm, individually, be disqualified
from providing representation to Grosser-Samuels or Burns.  The

28

court has concluded that such a disqualification would be
appropriate.  Rule 1.09(b) of the Texas Disciplinary Rules of
Professional Conduct provides, with an exception not applicable
here, that "when lawyers are or have become members of or
associated with a firm, none of them shall knowingly represent a
client if any one of them practicing alone would be prohibited
from doing so" because of a conflict disqualification.  Tex.
Disciplinary R. Prof. Conduct 1.09, Tex. Gov't Code Ann., tit. 2,
subtit. G, app. A (Vernon 2005).  The justification for such a
rule was noted by the Fifth Circuit in <u>American Airlines</u>, when it
said that "[a] second irrebuttable presumption is that
confidences obtained by an individual lawyer will be shared with
the other members of his firm."  972 F.2d at 614 n.1.

Therefore, the court is ordering that all attorneys
associated with Schultz's law firm likewise are disqualified.

### VII.

#### The Request for Sanctions

The court has decided to hold in abeyance the request of JDE
and duNouveau for sanctions against Schultz and his firm.  While
a decision on the request would be appropriate at this time under
the record already made, the court when making a decision would
prefer to take into account any further developments there are on
the representation issue.  Before making a decision, the court
probably will hear from the parties relative to the possibility
of disciplinary action against Schultz under the authority of

29

rules LR 83.8(b)(1) and (3) of the local civil rules of this court.

VIII.

Order

For the reasons stated above,

The court ORDERS and DECLARES that Schultz and each attorney associated (either as a partner, an associate, as of counsel, as a shareholder, or otherwise) with the law firm with which Schultz is associated are disqualified from providing representation to Grosser-Samuels or Burns in, or in connection with, the above-captioned action.

The court further ORDERS that by 2:00 p.m. on September 20, 2006, Grosser-Samuels and Burns each file a document informing the court of the identity of the attorney who will be representing her or him in this action, including the attorney's contact information; or, if Grosser-Samuels or Burns plans to proceed pro se in this action, she or he file a document by such time and date advising the court of that fact and providing the court contact information pertaining to her or him.

The court further ORDERS that the stay as to discovery ordered by the order signed in this action on March 30, 2006, and the more general stay ordered by the order signed March 31, 2006, be, and are hereby, lifted.

SIGNED September  13 , 2006.

    /s/ John McBryde
JOHN McBRYDE

30

United States District Judge